JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

SEAN MURTAUGH

**DEFENDANTS**

ROBERT S. GOGGIN, III, ESQUIRE, GOGGIN & DUCKWORTH, P.C., FORCENO GOGGIN & KELLER, P.C., KELLER & GOGGIN, P.C., JORDAN LITIGATION FUNDING, LLC and NORRIS JORDAN

**(b)** County of Residence of First Listed Plaintiff    Delaware
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Zachary S. Feinberg, Esquire
Freiwald Law, P.C., 1500 Walnut St., 18th Fl., Phila., PA 19102
(215) 875-8000

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1962

Brief description of cause: This case arises out of Defendants' scheme to defraud Plaintiff Sean Murtaugh out of hundreds of thousands of dollars through unauthorized, deceptive, and predatory litigation funding agreements.

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $   TBD

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**

*(See instructions):*

JUDGE            DOCKET NUMBER

DATE
January 3, 2024

SIGNATURE OF ATTORNEY OF RECORD
s/Aaron J. Freiwald

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: 613 Dayton Road, Bryn Mawr, PA 19010

Address of Defendant: 1420 Walnut Street, Suite 1108, Philadelphia, PA 19102

Place of Accident, Incident or Transaction: 1420 Walnut Street, Suite 1108, Philadelphia, PA 19102

---

***RELATED CASE IF ANY:***

Case Number: _____ Judge: _____ Date Terminated _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit Pending or within one year previously terminated action in this court?    Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier Numbered case pending or within one year previously terminated action of this court?    Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se case filed by the same individual?    Yes ☐   No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ **is not** related to any now pending or within one year previously terminated action in this court except as note above.

DATE: January 3, 2023     s/Aaron J. Freiwald             78028

           *Attorney-at-Law (Must sign above)*         *Attorney I.D. # (if applicable)*

---

**Civil (Place a √ in one category only)**

*A. Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☐ 8. Employment
☐ 9. Labor-Management Relations
☐ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☒ 15. All Other Federal Question Cases. *(Please specify)* 18 U.S.C. § 1962

*B. Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify)*: _____
☐ 7. Products Liability
☐ 8. All Other Diversity Cases: *(Please specify)* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration)*

I, _____, counsel of record *or* pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2 § 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: _____        _____        _____
                               *Attorney-at-Law (Sign here if applicable)*       *Attorney ID # (if applicable)*

NOTE: A trial de novo will be a jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| SEAN MURTAUGH | : | CIVIL ACTION |
| v. | : | |
| ROBERT S. GOGGIN, III, ESQUIRE, et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.          ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (X)

| | | |
|---|---|---|
| January 3, 2024 | Aaron J. Freiwald | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-875-8000 | 215-875-8575 | ajf@freiwaldlaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**



**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SEAN MURTAUGH<br>613 Dayton Road<br>Bryn Mawr, PA 19010<br><br>      v.<br><br>ROBERT S. GOGGIN, III, ESQUIRE<br>1420 Walnut Street, Suite 1108<br>Philadelphia, PA 19102<br>    and<br>GOGGIN & DUCKWORTH, P.C.<br>1420 Walnut Street, Suite 1108<br>Philadelphia, PA 19102<br>    and<br>FORCENO GOGGIN & KELLER, P.C.<br>1420 Walnut Street, Suite 1108<br>Philadelphia, PA 19102<br>    and<br>KELLER & GOGGIN, P.C.<br>1420 Walnut Street, Suite 1108<br>Philadelphia, PA 19102<br>    and<br>JORDAN LITIGATION FUNDING, LLC<br>1601 Sansom Street, Suite 2E<br>Philadelphia, PA 19103<br>    and<br>NORRIS JORDAN<br>1601 Sansom Street, Suite 2E<br>Philadelphia, PA 19103 | NO. |

## COMPLAINT

### I.    INTRODUCTION

1.    This case arises out of Defendants' scheme to defraud Plaintiff Sean Murtaugh out of hundreds of thousands of dollars through unauthorized, deceptive, and predatory litigation funding agreements.  Defendant Robert Goggin, a plaintiff's attorney in Philadelphia, used Mr. Murtaugh's case as collateral to secure cash advances with high interest rates and promised to

repay this debt out of the proceeds of Mr. Murtaugh's case.  Defendant Goggin took this money – and Defendant Jordan Litigation Funding willingly provided it – despite knowing that Mr. Murtaugh had not idea about these agreements, did not consent to the agreement, and never would have consented to the agreements.  Defendants Goggin and Jordan Litigation Funding hatched this scheme to enrich themselves through exorbitant interest rates at the expense of Mr. Murtaugh, whose case involved serious and debilitating workplace injuries.

## II.    PARTIES

2.      Plaintiff Sean Murtaugh is an adult citizen of the Commonwealth of Pennsylvania who resides at 613 Dayton Road, Bryn Mawr, Pennsylvania 19010.

3.      Defendant Robert S. Goggin, III ("Goggin") is an attorney licensed to practice law in the Commonwealth of Pennsylvania who maintains professional offices at 1420 Walnut Street, Suite 1108, Philadelphia, Pennsylvania 19102. <u>Plaintiff asserts both a professional liability claim and non-professional liability claims against this defendant</u>.

4.      Defendant Goggin & Duckworth, P.C. is a law firm that is registered to do business in Pennsylvania and that has a principal place of business at 1420 Walnut Street, Suite 1108, Philadelphia, Pennsylvania 19102. <u>Plaintiff asserts both a professional liability claim and non-professional liability claims against this defendant</u>.

5.      Defendant Forceno Goggin & Keller, P.C., is a law firm that is registered to do business in Pennsylvania and that has a principal place of business at 1420 Walnut Street, Suite 1108, Philadelphia, Pennsylvania 19102. <u>Plaintiff asserts both a professional liability claim and non-professional liability claims against this defendant</u>.

6.      Defendant Keller & Goggin, P.C., is a law firm that is registered to do business in Pennsylvania and that has a principal place of business at 1420 Walnut Street, Suite 1108,

Philadelphia, Pennsylvania 19102. <u>Plaintiff asserts both a professional liability claim and non-professional liability claims against this defendant</u>.

7.     Defendants Goggin & Duckworth, P.C., Forceno Goggin & Keller, P.C., and Keller & Goggin, P.C. are corporate entities and/or trade names used by Defendant Goggin as his law firm, but are, in fact, alter egos, successors, subsidiaries, and/or instrumentalities of each other.  These Defendants are collectively referred to as "the Goggin Firm."

8.     At all relevant times, Defendants Goggin and the Goggin Firm provided legal services to Mr. Murtaugh through their various attorneys, paralegals, and support staff.

9.     Defendant Goggin Firm is vicariously liable for the fraudulent, negligent, and unethical services provided to Mr. Murtaugh, by and through its attorneys, paralegals, support staff, agents, servants, employees, and ostensible agents, including, but not limited to, Defendant Goggin.

10.     At all relevant times, Defendant Goggin was an owner, shareholder, partner, officer, director, employee, agent, and/or ostensible agent of Defendant Goggin Firm.

11.     At all relevant times, Defendant Goggin was responsible for overseeing the legal services provided to Mr. Murtaugh while Mr. Murtaugh was a client of Defendant Goggin Firm.

12.     Defendant Jordan Litigation Funding, LLC is a corporate entity registered to do business in Pennsylvania with a principal place of business located at 1601 Sansom Street, Suite 2e, Philadelphia, Pennsylvania 19103.

13.     Defendant William Norris Jordan, Jr. ("Norris Jordan") is an adult citizen of the Commonwealth of Pennsylvania who maintains professional offices at 1601 Sansom Street, Suite 2e, Philadelphia, Pennsylvania 19103.

14.     At all relevant times, Defendant Norris Jordan was an owner, shareholder, member, partner, officer, director, employee, agent, and/or ostensible agent of Defendant Jordan Litigation Funding.

## III.   JURISDICTION

15.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, also known as federal question jurisdiction.

16.     Plaintiff has brought this action under 18 U.S.C. § 1962(C) and 18 U.S.C. § 1962(D).

17.     Further, this Court has supplemental jurisdiction over the state common-law claims, pursuant to 28 U.S.C. § 1367.

18.     Venue is proper, pursuant to 28 U.S.C. § 1391(b), because the events or omissions giving raise to Plaintiff's statutory and common-law claims occurred in this District.

## IV.   FACTS

### A.     Mr. Murtaugh suffered a workplace injury while working at AMTRAK

19.     Beginning around 2009, Plaintiff Mr. Murtaugh began working for Amtrak as a Lineman.

20.     Mr. Murtaugh was a union employee, part of the Brotherhood of Maintenance of Ways Employees (BMWE).

21.     On January 18, 2018, Mr. Murtaugh was installing a feeder arm on a pole with a T-Mobile antenna atop the pole near Paoli station in Paoli, Pennsylvania.

22.     The T-Mobile antenna contained active, high levels of RF and EMF energy, which was not deactivated before Mr. Murtaugh began working on the pole.

-4-

23.     While Mr. Murtaugh, and his co-worker Steve Price, were in the aerial man basket in the proximity of the T-Mobile antenna, he began to experience disorientation, cognitive loss, dizziness, dry heaving, nausea, and other similar neurological symptoms.

24.     Mr. Murtaugh had a titanium medical implant in his head and neck region, which Amtrak was aware of, and which acted as an amplifier of RF and EMF energy.

25.     Mr. Murtaugh went to Paoli Hospital, where he was diagnosed in the emergency department with only dehydration. He was discharged that day.

26.     When the tinnitus and headaches did not improve after a few days, Mr. Murtaugh was admitted to Jefferson University Hospital for night from January 26 to 27, 2018.  While at Jefferson, he was diagnosed with severe tinnitus.

27.     Mr. Murtaugh required evaluations by a neurologist, Dr. Christopher J. Reid.  Dr. Reid ordered a brain MRI on January 23, 2018 that did not reveal significant findings.

28.     Mr. Murtaugh was then evaluated by an otolaryngologist (ENT), Dr. Brian Broker.  Dr. Broker treated Mr. Murtaugh for tinnitus, treatment that included multiple injections into the middle ear space with Decadron.

29.     Mr. Murtaugh also treated with an audiologist, Karen K. Real, M.A., for about two years after the incident.  Ms. Real's treatment included fitting Mr. Murtaugh for hearing aids.

30.     The ongoing symptoms affected Mr. Murtaugh's ability to work, causing him to miss time from work from the accident until about July 2018.  Mr. Murtaugh did attempt to go back to work around July 2018, but went on disability leave again around December 2018 because it was too difficult to perform his union lineman job duties because of the continued symptoms from tinnitus and from headaches.

31.     Mr. Murtaugh again attempted to work from about April 2019 to August 2019, but again found his Amtrak job too difficult due to his ongoing symptoms.

32.     In addition to the treatment for his tinnitus, Mr. Murtaugh required treatment with a psychiatrist and psychologist for depression caused by the accident, the continued symptoms, and the inability to work.

33.     The above is merely a summary of the treatment Mr. Murtaugh received and he continues to suffer symptoms from his workplace injury up to the present.

**B.      Mr. Murtaugh hired Defendant Goggin and his firm to prosecute his claim against AMTRAK**

34.     Just a few days after the incident, Mr. Murtaugh hired Defendant Goggin and his firm.

35.     Mr. Murtaugh sought Defendant Goggin's representation because Defendant Goggin has a close relationship with the BMWE.

36.     Defendant Goggin has often attended union events to advertise his services for Federal Employers' Liability Act (FELA) cases and other personal injury cases.

37.     FELA is a federal statute that allows federal employees to bring claims against their employer for workplace injuries, essentially functioning as the worker's compensation statute for federal employees.

38.     Not only did Mr. Murtaugh hire Defendant Goggin, but so did Mr. Murtaugh's co-worker, Steve Price.

39.     The contingent fee agreement between Mr. Murtaugh and Defendant Goggin is undated, however, Defendant Goggin sent Mr. Murtaugh a letter on February 13, 2018 confirming his and his firm's representation of Mr. Murtaugh.

40.     The Contingent Fee Agreement is silent on whether Defendant Goggin has the right to take out litigation funding to cover case costs and then pass any accumulated interest onto Mr. Murtaugh.

41.     The Contingent Fee Agreement is also silent on how the repayment of liens asserted by Amtrak would be repaid and whether that number would be calculated before or after attorney fees paid.

42.     The Contingent Fee Agreement is also silent on Defendant Goggin's concurrent representation of Steve Price.  Defendant Goggin never explained that the concurrent representation may cause a conflict of interest between the two plaintiffs and Defendant Goggin did not obtain written informed consent for the concurrent representation.

43.     Defendant Goggin never explained the conflict that may occur if one of the two plaintiffs wanted to accept a settlement offer but the other plaintiff did not.

44.     On September 17, 2018, Defendant Goggin filed a single Complaint in the Court of Common Pleas of Philadelphia County on behalf of both Mr. Murtaugh and Mr. Price.  The Complaint was signed by Defendant Goggin's then-associate, now-partner James Duckworth.

**C.      Throughout the litigation Mr. Murtaugh made repeated promises to Mr. Murtaugh about a life-changing settlement amount, inducing Mr. Murtaugh to refrain from returning to work and inducing Mr. Murtaugh to take out a loan with Defendant Jordan Litigation Funding**

45.     Defendant Goggin told Mr. Murtaugh that his case was worth a life-changing amount of money – an amount so high that Mr. Murtaugh would never have to work again.

46.     Indeed, throughout the litigation, Defendant Goggin encouraged Mr. Murtaugh not to return to work, to create the appearance that Mr. Murtaugh's economic damages were rising.

47.     On December 18, 2019, Mr. Murtaugh received a letter from Amtrak stating that he was medically disqualified from his position as a Lineman CDL but was not terminated from his employment.

48.     The letter stated that Mr. Murtaugh could (a) submit medical documentation that his medical condition improved; (b) apply for sickness benefits or permanent disability through the RRB; (c) seek alternative positions within Amtrak; or (d) apply through an accommodation through Amtrak's ADA panel.

49.     This letter was received after Mr. Murtaugh made multiple attempts to return to work but was unable to consistently perform his job because of continued headaches and ringing in his ears.

50.     Because Defendant Goggin expressed such confidence in the case, he advised Mr. Murtaugh to do nothing in response to the letter and to stay out of work so that his lawsuit damages could accumulate.

51.     Mr. Murtaugh then received disability benefits from his Amtrak job until he reached the maximum benefit sometime in mid-to-late 2020.

52.     While Defendant Goggin was promising Mr. Murtaugh a fortune, in the meantime, Mr. Murtaugh was without employment and lost his health and dental benefits.

53.     Upon advising Mr. Murtaugh not to seek any alternate employment, Defendant Goggin failed to advise Mr. Murtaugh on how to seek any other income source, such as social security disability benefits.

54.     Instead, knowing that Mr. Murtaugh needed money and having recommended that Mr. Murtaugh not return to work, Defendant Goggin recommended that Mr. Murtaugh enter a litigation funding agreement with Defendant Jordan Litigation Funding.

55.     On Friday November 27, 2020, Mr. Murtaugh sought clarification from Defendant Goggin about the litigation funding agreement, texting Mr. Goggin, "Bob hope you had a good holiday[.] Are you working today[?] Want to discuss the loan process and other details thanks.

56.     Defendant Goggin replied about three hours later, at 11:52 am and wrote, "Sean, my next sober breath is on Monday. Talk to you then!"

57.     On or about December 18, 2020, Mr. Murtaugh signed a Litigation Funding Agreement with Defendant Jordan Litigation Funding.

58.     In the December 18, 2020 agreement, Defendant Jordan Litigation Funding agreed to pay Mr. Murtaugh $5,510.00 per month for six consecutive months, for a total of $33,060.

59.     The December 18, 2020 agreement included a Schedule of Payment that specified the amount due from two years beyond signing, but did not contemplate an accumulation of interest beyond the two-year period.  The agreement displayed interest accumulating every three months and ending at the two-year mark.

60.     The only repayment schedule included in the December 18, 2020 agreement was limited to a two-year repayment amount for $9,412.06, as stated in the following chart:

| IF PAID ON OR BETWEEN | THEN PAY... | |
|---|---|---|
| 12/19/2020 - 03/18/2021 | $6,157.19 | |
| 03/19/2021 - 06/18/2021 | $6,541.01 | |
| 06/19/2021 - 09/18/2021 | $6,950.89 | |
| 09/19/2021 - 12/18/2021 | $7,385.32 | 1 YR |
| 12/19/2021 - 03/18/2022 | $7,846.90 | |
| 03/19/2022 - 06/18/2022 | $8,337.33 | |
| 06/19/2022 - 09/18/2022 | $8,858.41 | |
| 09/19/2022 - 12/18/2022 | $9,412.06 | 2 YR |

61.     The Agreement did not specify if this was the total interest to be repaid on all six payments, or the repayment amount for just one single payment.

62.     The December 18, 2020 agreement also indicated that a material reason for Defendant Jordan Litigation Funding entering the agreement was its confidence in Defendant Goggin.

63.     In small fine print on the last page of the agreement, sentence #13 of the Miscellaneous Paragraph, Jordan Litigation Funding indicated that it was charging a 28% rate but reduced the rate to 25% because Mr. Murtaugh's attorney was Defendant Goggin.

64.     The Agreement specified, "Client is specifically aware that this contract is made on the basis of not only the facts and law in this matter but also upon Jordan Litigation Funding's confidence in current counsel."

65.     If not for Defendant Goggin's advice that Mr. Murtaugh not seek work, Mr. Murtaugh would not have required any litigation funding agreement.

66.     Almost immediately, there were questionable circumstances between Mr. Murtaugh and Jordan Litigation Funding.

67.     The first check from Jordan Litigation Funding took almost a week and half to clear into Mr. Murtaugh's bank account.

68.     The next month, even though Jordan Litigation Funding was supposed to provide the funding via direct deposit, it instead paid Mr. Murtaugh via certified check.

69.     The certified check was not provided directly to Mr. Murtaugh; it had to go through Defendant Goggin as an intermediary.

70.     As the case went on and Mr. Murtaugh continued to follow Defendant Goggin's advice to not return to work, Mr. Murtaugh's personal life was being harmed.

71.     On February 16, 2021, Mr. Murtaugh texted Defendant Goggin and asked, "Any word on dental [insurance] for the kids?"

72.     Defendant Goggin did not respond in writing to this text.

73.     On March 9, 2021 at 12:15pm, Mr. Murtaugh texted Defendant Goggin and asked, "Bob I need to know about insurance?"

74.     Defendant Goggin replied, "Calling again now," but did not otherwise answer Mr. Murtaugh's question.

75.     Later that day, at 4:18pm, Mr. Murtaugh texted Defendant Goggin again and stated, "Bob this isn't working! We need to discuss tomorrow how we are going to go forward. My family comes before everyone and everything and your (sic) just not getting the job done! So we need to talk tomorrow."

76.     Defendant Goggin responded simply, "Very good."

77.     The next day, March 10, 2021, Mr. Murtaugh and Defendant Goggin texted again and made plans to meet on March 11, 2021 at 4pm at a diner in Wayne, PA.

78.     Mr. Murtaugh asked Defendant Goggin to bring with him a copy of Mr. Murtaugh's file.

79.     Defendant Goggin refused to provide a complete copy of the file, stating that it was too large to copy by tomorrow, and stated he would bring the pertinent portions of the file.

80.     During the March 11, 2021 meeting, Defendant Goggin advised Mr. Murtaugh that it would cost Mr. Murtaugh $1,500.00 to receive a copy of his file.

81.     Also during the meeting, Mr. Murtaugh expressed to Defendant Goggin that Mr. Murtaugh was severely struggling financially and that he would need to go back to work.

82.     The morning after their meeting, on March 12, 2021 at 10:44am, Defendant Goggin texted Mr. Murtaugh, "Don't go back to AMTRAK until after you deposition. We don't want to answer their questions on it. After the dep it's too late for them!"

83.     In April 2021, Mr. Murtaugh gave a deposition.  Mr. Murtaugh does not have a copy of the transcript for his deposition despite repeated requests to Defendant Goggin for a copy, both directly and through undersigned counsel.

84.     On September 24, 2021 at 8:52am, Mr. Murtaugh again expressed concern to Defendant Goggin, sending him a text message stating, "As of September 1st myself and my kids no longer have health benefits."

85.     Defendant Goggin did not respond in writing to this text.

86.     Mr. Murtaugh told Defendant Goggin that he would be seeking employment with PECO.

87.     Defendant Goggin encouraged Mr. Murtaugh to not seek the employment, because Amtrak would find out about the employment through certain competency tests and Defendant Goggin believed it would hurt the case if Amtrak found out about any employment.

88.     Yet, desperate for income and health benefits, Mr. Murtaugh started employment with PECO in November 2021.

89.     On March 28, 2022, Mr. Murtaugh texted Defendant Goggin to ask if there was any news on his case.  Defendant Goggin responded by simply stating "Zero."  Mr. Murtaugh then responded, expressing dismay that "All these loans are going to max out on interest."

90.     Mr. Murtaugh's text reveals his belief that the interest on the litigation funding payments he received from Defendant Jordan Litigation Funding were limited to collecting for only two years based on the Disclosure Statement included in the agreement.

91.     In the summer and fall of 2022, Amtrak began conducting video surveillance on Mr. Murtaugh and eventually served a subpoena on Mr. Murtaugh's new employer PECO.

92.     Defendant Goggin had been encouraging Mr. Murtaugh to keep the fact of his employment from PECO a secret.

93.     But based on Defendant Goggin's encouragement of secrecy, Mr. Murtaugh became concerned about the surveillance and subpoena, texting Defendant Goggin on September 27, 2022 that "If this is going to cost me my job we need to fix that."

94.     Several times in October 2022, Mr. Murtaugh reached out to Defendant Goggin by text and calls, but Defendant Goggin did not make himself available to speak with Mr. Murtaugh.

95.     On November 16, 2022, Mr. Murtaugh texted Defendant Goggin to express his dissatisfaction with how the case was going, stating "Can't tell you how [un]happy I am with the performance of this lawsuit! All the bullshit is finally catching up there's a chance I could lose my job! 5 fucking years Bob 5 fucking years."

96.     Defendant Goggin obtained reports from nine experts for Mr. Murtaugh's case, including:

a.     Rosette C. Biester, Ph.D. (Neuropsychology), dated 2/11/2020;

b.     Burton Weiss, M.D. (Psychiatry), dated 2/26/2021;

c.     Neil K. Shirk (Engineering), dated 3/26/2021 (superseding the prior expert report dated October 7, 2019);

d.     Huma Haider, M.D., Director of National Brain Injury Institute, dated 4/12/2021;

e.     Guy W. Fried, M.D. (Physical Medicine & Rehabilitation), dated 5/28/2021;

f.     Shahin J. Korangy, M.D., Eliterad Radiology Group/National Brain Injury Institute (Neuroradiology), dated 6/23/2021;

g.     Rosette C. Biester, Ph.D. (Neuropsychology), dated 7/29/2021 (supplemental report);

h.     Burton Weiss, M.D. (Psychiatry), dated 7/30/2021 (supplemental report);

i.     Guy W. Fried, M.D. (Physical Medicine & Rehabilitation), dated 8/2/2021;

j.     Alex Karras, OTR, CRC, CCM, MSCC, CLCP (Life Care Planning), dated 8/2/2021;

k.     Terence H. Walsh, BA, MSW, CRC (Vocational), dated 8/2/2021; and

l.     Andrew C. Verzilli, M.B.A. (Economist), dated 8/2/2021.

97.     Meanwhile, Amtrak defended the case with the expert reports of Daniel Feinberg, M.D. (Neurology), Matthew Nagorsky, M.D. (Otolaryngology), and Kenneth Foster, Ph.D., P.E. (Biological Engineering).

98.     T-Mobile also produced the expert report of physicist Stephen Sutkowski to dispute the liability aspect of the case.

99.     Defendant Goggin indicated in the pre-trial memo that he would present $2,570,408.40 in economic damages at Mr. Murtaugh's trial.

**D.    Defendant Goggin improperly induced Mr. Murtaugh to settle his case**

100.    Entering 2023, the case had a trial date set for March 6, 2023.

101.    Ahead of trial, the Philadelphia Court of Common Pleas served an Order For Mandatory Settlement Conference, scheduling a settlement conference for January 31, 2023 at 10:00am before the Honorable Marlene Lachman.

102.    The Order specifically directs, "All persons who have the authority to negotiate and settle the case shall be available at the Mandatory Settlement Conference. These persons include the parties, an insurance or similar representative, and anyone who is needed to ratify a settlement agreement."

103.    The Mandatory Settlement Conference was attended by Defendant Goggin, but Mr. Murtaugh was not present himself.

104.    Mr. Goggin did not invite Mr. Murtaugh to attend the Mandatory Settlement Conference.

105.    Before the Mandatory Settlement Conference, Plaintiff's former counsel Mr. Goggin conveyed a $10 million settlement demand purportedly on Mr. Murtaugh's behalf.

106.    During the Mandatory Settlement Conference, counsel for Amtrak and T-Mobile made a settlement offer but that offer was rejected by Mr. Goggin without consulting Mr. Murtaugh.

107.    On January 31, 2023 at 3:09 p.m., Defendant Goggin texted both Mr. Murtaugh and Mr. Price, stating "They quit at $215k. I reject it. The discussions will continue.

-15-

108.     Shortly after, at 3:37pm, Mr. Murtaugh texted Defendant Goggin, "I guess it's like you said in the beginning the real number will come at the door of the courthouse before trial."

109.     Mr. Murtaugh and Defendant Goggin did not speak again until February 8, 2023.

110.     During this call, Defendant Goggin informed Mr. Murtaugh that Amtrak had made a settlement offer of $475,000 and that this would be the highest number Amtrak would settle for.

111.     Even though this settlement amount was far less that Defendant Goggin had advised the case would settle for – Defendant Goggin had promised Mr. Murtaugh a life-changing amount of money such that Mr. Murtaugh would not have to work again – Defendant Goggin now recommended the settlement.

112.     During this call, Mr. Murtaugh asked Defendant Goggin what the case costs and fees were.

113.     Defendant Goggin was unable and unwilling to tell Mr. Murtaugh this information during the phone call.

114.     Mr. Murtaugh replied that he would need to think about the settlement offer.

115.     Defendant Goggin did not make any further outreach to Mr. Murtaugh or provide an update with the outstanding case costs and fees until February 21, 2023 when he left Mr. Murtaugh a voicemail.

116.     Defendant Goggin and Mr. Murtaugh spoke on February 22, 2023 for 4 minutes and on February 24, 2023 at 3:42 p.m. for 6 minutes.

117.     During both calls, Defendant Goggin reiterated that the $475,000 offer from Amtrak was the most amount of money to settle the case and was unwilling to provide Mr.

Murtaugh with the outstanding case costs and fees so that Mr. Murtaugh could understand the net-take home amount he would receive.

118.    Rather, Defendant Goggin intentionally withheld this information and stated he could not obtain it quickly.

119.    Defendant Goggin added to the time pressure of this situation by telling Mr. Murtaugh that if he did not accept the settlement on February 24th, the settlement offer would be revoked. There is no documented evidence that Amtrak had actually threatened to withdraw the settlement offer if it was not accepted on February 24th and it is very unlikely and against common practice for a defendant to withdraw the settlement offer within that timeline before trial.

120.    Defendant Goggin also made it apparent that he was not prepared for trial, informing Mr. Murtaugh that none of the experts were scheduled to testify, even though trial was only 10 days away.

121.    The February 24, 2023 call ended with Mr. Murtaugh posing questions about the settlement to Defendant Goggin but not agreeing to the settlement.

122.    Despite Mr. Murtaugh not authorizing the settlement, Defendant Goggin communicated acceptance of the settlement on his behalf to Amtrak's counsel after the February 24, 2023 call.

123.    On February 24, 2023 at 6:12 p.m., Amtrak's counsel emailed Mr. Goggin:

"Bob,

This will confirm the settlement of this matter for [redacted] per plaintiff, with Amtrak contributing [redacted] towards each settlement and T-Mobile contributing $[redacted] per plaintiff.

> As discussed the settlement includes a confidentiality agreement
> and letter agreement not to return to work at Amtrak. As always,
> any and all liens will come out of the settlement amounts.
>
> Thanks and have a great weekend.
>
> John"

124.    Defendant Goggin did not respond to counsel for Amtrak's email;

125.    Mr. Murtaugh and Defendant Goggin spoke again the next day, Saturday February 25, 2023.  During this conversation, Mr. Murtaugh asked Defendant Goggin to explain how the case suddenly went from a $10 million case to now being faced with a $475,000 settlement.

126.    During the February 25, 2023 conversation, Mr. Murtaugh still did not authorize the settlement and was not aware that Defendant Goggin had done so on his behalf.

127.    Then, on Monday February 27, 2023 at 11:22 a.m., Mr. Murtaugh and Defendant Goggin spoke again for about six minutes.

128.    During this call, while Mr. Murtaugh was facing a trial only one week away, and with it being clear that Defendant Goggin was not prepared for trial, and with Defendant Goggin having communicated that Amtrak would withdraw the settlement offer if he did not accept, Mr. Murtaugh was left with no choice but to accept the settlement offered by Amtrak.

129.    At the time he accepted the settlement offer, Mr. Murtaugh still did not have all the necessary information to properly assess the offer, including a rough estimate of his net take home number.

130.    Further, Mr. Murtaugh did not know on February 27, 2023 that Defendant Goggin had already accepted the settlement on his behalf and without his permission.

131.    Then, within an hour after Mr. Murtaugh for the first time communicated

acceptance of the settlement, on February 27, 2023 at 12:17 p.m., Defendant Goggin, filed a

letter with the Philadelphia Court of Common Pleas stating:

>   "Mr. Price:
>
>   Please be advised that the Steven Price and Sean Murtaugh v.
>   National Railroad Passenger Corporation and T-Mobile Northeast
>   LLC matter, scheduled for Jury Selection of March 2, 2023, and
>   Trial on March 6, 2023, at 9:00 am and pending Motions in Limine
>   has settled and therefore will no longer need to go forward.
>
>   If you have any questions or concerns in this regard, please do not
>   hesitate to contact the office."

132.    Aside from the February 27, 2023 letter, there are no other writings in which

Defendant Goggin, comments on or memorializing the terms of the alleged settlement between

Mr. Murtaugh, Amtrak and T-Mobile.

**E.      Only after settling his case, Mr. Murtaugh learned that Defendant Goggin
          took out additional funding agreements with Defendant Jordan Litigation
          Funding – purportedly in Mr. Murtaugh's name, but without his knowledge
          or consent**

133.    It took several months for Defendant Goggin to provide Mr. Murtaugh with an

accounting for his case, despite multiple requests by Mr. Murtaugh.

134.    On March 14, 2023, Mr. Murtaugh emailed Defendant Goggin's assistant, Sandy

Andujar, and asked, "I was wondering if you had any information regarding the finalization of

my case."

135.    On March 15, 2023 at 2:55pm, Ms. Andujar wrote back and provided the costs

below in Mr. Murtaugh's case:

>   "Personal Money Borrowed from Jordan Litigation Funding -
>   $56,825.26
>   Cost - $130,567.18 (experts, depositions, medical records, etc.)
>   Keller & Goggin Fee - $118,750. (25%) of settlement)

RRB - $34,313.88
If you have any questions pertaining to any of these amounts
please reach out to Bob."

136.    Ms. Andujar's email is false and misleading because the costs in Mr. Murtaugh's case were not $130,567.18.

137.    As became clear to Mr. Murtaugh only after further communication, the $130,567.18 number only was based on Defendant Goggin having taken out additional litigation funding with Defendant Jordan Litigation, without Mr. Murtaugh's consent or knowledge, and was attempting to charge the interest for this funding against Mr. Murtaugh.

138.    Mr. Andujar's March 15, 2023 email, sent on behalf of Defendants Goggin and Goggin Firm, attempts to conceal this fact from Mr. Murtaugh by including all interest in one line as "costs."

139.    Mr. Murtaugh replied about 20 minutes later and asked for an itemized list of the costs for his case, as well as a separate email asking if there was a final take-home number.

140.    Ms. Andujar replied right away promising to get Mr. Murtaugh an itemized list for the costs.  She also indicated that they hoped to have the settlement agreement soon.

141.    A week later, on March 23, 2023, not having heard anything from Defendant Goggin's office, Mr. Murtaugh wrote to Ms. Andujar again asking if there was "any luck?" on getting the settlement agreements.

142.    The same day, at 1:19pm, Mr. Murtaugh emailed Ms. Andujar and asked, "Hi Sandi, not sure if you received my email 2 weeks ago. But was wondering if you could send me that itemized list and final bring home number."

143.    On March 28, 2023, Defendant Goggin sent Mr. Murtaugh a draft of the settlement release proposed by Amtrak and T-Mobile.

144.    More than a month after his request for an accounting of all costs, on April 18, 2023, Ms. Andujar emailed Mr. Murtaugh, with a copy to Defendant Goggin, a list purporting to be all the costs and fees in Mr. Murtaugh's case.

145.    Ms. Andujar's April 18, 2023 email included the following items:

   a.    "Personal Money Borrowed - $33,060. And current amount due is **$59,450.44** – this amount is subject to change because it accrues interest daily."

   b.    "Keller & Goggin 25% Fee in the case **$118,750.**"

   c.    "Cost we paid in your case for Experts, Medical Bills, Depositions, etc. is $81,246.47.  This is not your total payback because almost all of this money was borrowed and is accruing daily and the amount changes. Date and Amount Borrowed and amount due as of today. ($136,647.81 is your total due on this money)"

   d.    "RRB and Supplemental - **$31,332.65**"

146.    Ms. Andujar's April 18, 2023 email then detailed six litigation funding payments that Defendant Goggin had unilaterally received without Mr. Murtaugh's consent or knowledge, conveying the following information:

| Date | Advance Amount | Amount Due |
|---|---|---|
| 7/6/2020 | $2,403.73 | $6,645.30 |
| 2/18/2020 | $1,500.00 | $3,502.15 |
| 4/16/2021 | $35,000.00 | $69,228.68 |
| 7/16/2021 | $17,910.00 | $33,054.01 |
| 10/31/2021 | $13,000.00 | $22,346.52 |
| 2/18/2022 | $1,155.00 | $1,871.15 |
| Total | $70,968.73 | **$136,647.81** |

147.    There are several problems with and falsehoods in Ms. Andujar's email.

148.    First, while Mr. Murtaugh does not recognize the litigation funding agreement he signed with Defendant Jordan Litigation Funding as enforceable, even if it were, Mr. Murtaugh never agreed to pay interest that accrues daily or interest beyond two years.

149.    Second, Mr. Murtaugh had no idea that Mr. Goggin had received litigation funding to cover case costs and Mr. Murtaugh never agreed to pay interest on any of those case costs.

150.    Third, because the amounts listed as owed to "RRB and Supplemental" – the Railroad Retirement Board and Supplemental Sickness Benefits Lien – are taken directly from the settlement as a matter of law, Mr. Murtaugh never agreed to have Defendant Goggin take his fee after accounting for these amounts.

151.    Mr. Murtaugh replied to Ms. Andujar's email two days later, on April 20, 2023, with confusion and anger:

> Hi Sandi
>
> I am Very confused was wondering if you could help me understand.
>
> So I have interest ACCRUING daily. It took over a month to get this info so I have been getting charged for that ?
>
> Also confused on why all this money was borrowed and ACCRUING interest when I wasn't aware of that ?
>
> Also I still haven't been told my final number that I am walking with?
>
> I understand the personal money that I borrowed but could you tell me what the [$70,000] dollar loan from Jordan Lending was used for in detail?
>
> Also I still haven't received those contracts with the bills or Dr Beaster

I've been asking these questions to Bob for years with no response just the same old run around.

Hope you understand where I am coming from this whole experience has been absolutely horrible sorry your (sic) in the middle

Because all the forms and emails we get says (sic) contact Bob or the office. I haven't heard from Bob in some time now !!

So Again I will not sign any release unless there is a complete and exact accounting of every expense and cost with complete documentation from providers, including any fees paid to you as well as an EXACT amount I am to receive.

152.    Mr. Murtaugh's April 20, 2023 email confirms that he had no idea Mr. Murtaugh took out litigation funding to cover case costs and that he did not agreed to pay daily accruing interest in his agreement with Jordan Litigation Funding.

153.    A week passed and Mr. Murtaugh had still not heard from Defendant Goggin. Mr. Murtaugh sent a letter to Defendant Goggin on April 27, 2023 asking again for a detailed report of all costs, fees, and expenses with receipts; a complete copy of his file; and a copy of all agreements with Jordan Litigation Funding.

154.    Ms. Andujar replied on May 5, 2023, and stated "Good morning, I will have the rest of your document and information to you later today. I apologize for the delayed response."

155.    Ms. Andujar's response was false and she did not provide any more information until May 10, 2023.

156.    On May 10, 2023, Ms. Andujar emailed Mr. Murtaugh, with a copy to Defendant Goggin, certain invoices and a recap letter.

157.    The recap letter asserted total costs of $209,324.92, with a line item of $77,278.77 for expert costs and $65,679.08 for "fee for advanced costs."

158.    The "fee for advance costs" represents the amount of interest on the litigation

funding payments Defendant Goggin took out in Mr. Murtaugh's case, without Mr. Murtaugh's

knowledge or consent.

159.    Despite claiming to be providing all relevant documents, Ms. Andujar and

Defendant Goggin's office did not send the litigation funding agreements between Defendants

Goggin and Jordan Litigation Funding.

160.    Mr. Murtaugh responded the next day, asking again for all of the litigation

funding documents and expressing confusion over the interest claimed, writing:

> Hi Sandy/Bob
> Could you please send me all the paper work on "Cost Borrowed"
> portion of the bill ? Were there loans [t]aken out for that ? Also the
> personal money borrowed on the contract signed for the interest
> chart it only has 2 years posted on if paid on or between last date
> being $9,412.06 09/19/2022-12/18/2022 for a total of interest on
> loan. Which would bring total amount on loan and interest to
> $42,472.06 but on your paperwork it says $59,450.44 ? Thanks!

161.    Mr. Murtaugh's email shows that he believed there could only be a maximum

interest of $9,412.06 for the litigation funding he had taken out with Jordan Litigation Funding.

162.    Defendant Goggin did not respond to Mr. Murtaugh's email asking for documents

relating to the "Cost Borrowed" section of the recap letter, so Mr. Murtaugh had to follow up

again on May 24, 2023.

163.    Ms. Andujar responded on May 25, 2023 asking for clarification as to what Mr.

Murtaugh was requesting.

164.    Mr. Murtaugh responded, stating "Clearly they are loans that I knew nothing

about with interest so if I could have all the paper work on them plus the interest rate they were

agreed to. Also Sandi again if I could get a complete copy of my file I would appreciate it."

165.    On May 30, 2023, Defendant Goggin mailed Mr. Murtaugh a thumb drive purporting to contain Mr. Murtaugh's file.

166.    The thumb drive was noticeably missing several categories of documents, including any of the litigation funding agreements with Defendant Jordan Litigation Funding and any communications between Defendant Goggin and Defendant Jordan Litigation Funding.

167.    On June 8, 2023, Mr. Murtaugh emailed Ms. Andujar and stated, "Hi Sandy, Thanks for sending the thumb drive of my file. I wasn't able to find those loans I was talking about form last email. Can you point me in the right direction? Thanks Sean."

168.    Ms. Andujar replied about an hour later and finally provided the agreements between Defendant Goggin and Defendant Jordan Litigation Funding.

169.    After months of asking for a full accounting on his case and Defendant Goggin's repeated attempts to hide the truth, Mr. Murtaugh finally learned about the many secret agreements between Defendants Goggin and Jordan Litigation Funding.

170.    Defendant Goggin provided Mr. Murtaugh with five agreements between Goggin and Defendant Jordan Litigation Funding for providing Defendant Goggin with money to pay for case expenses:

      a.      July 7, 2020: $2,403.73

      b.      February 19, 2021: $1,500.00

      c.      April 17, 2021: $35,000.00

      d.      July 17, 2021: $17,910.00

      e.      October 14, 2021: $13,000.00

171.    Absent from the documents provided by Defendant Goggin was the agreement from February 18, 2022 for $1,155.00 referenced in earlier emails by Defendant Goggin's office.

172.     The July 7, 2020 agreement contained an electronic signature for Mr. Murtaugh, however none of the other agreements contained any form of signature by Mr. Murtaugh.

173.     In total, Defendant Goggin received $70,968.73 in litigation funding from Defendant Jordan Litigation Funding, which was collateralized against Mr. Murtaugh's case.

174.     Defendant Jordan Litigation Funding agreed to provide this funding despite knowing that Mr. Murtaugh was unaware of and did not agree to the funding.

175.     At no point did Defendant Jordan Litigation Funding attempting to contact Mr. Murtaugh about these funding agreements, as promised on its website.

176.     These litigation funding payments were then used, at least in part, to pay for Mr. Goggin's extensive use of expert witnesses.

177.     But Defendant Goggin then tried to recoup from Mr. Murtaugh both the cost of the expert witnesses and the interest on the unauthorized litigation funding agreements.

178.     At no time, either in the written fee agreement or at any other point, was Mr. Murtaugh informed for he would be responsible for interest accumulating on funding agreements taken out solely by Defendant Goggin.

179.     On August 24, 2023 Mr. Murtaugh terminated Defendant Goggin as his counsel.

180.     Mr. Murtaugh's new counsel wrote to Defendant Goggin seeking to receive a full and complete copy of Mr. Murtaugh's file, including all communications between Defendants Goggin and Jordan Litigation Funding relating to Mr. Murtaugh's case.

181.     Defendant Goggin ignored this request.

182.     On September 20, 2023, Amtrak filed a motion to enforce the settlement.

183.    Mr. Murtaugh's new counsel filed a response stating that there was insufficient information to respond to the motion because Defendant Goggin had not provided Mr. Murtaugh's new counsel with a complete copy of the file.

184.    On November 8, 2023, the Court of Common Pleas held a hearing on Amtrak's Motion to Enforce.

185.    The Honorable Judge Denis Cohen suggested the parties work to resolve the pending motion and finalize the settlement agreement in a manner to not waive any rights Mr. Murtaugh has against Defendant Goggin.

186.    Defendant Goggin also testified at the November 8, 2023 hearing, during which he gave false and misleading testimony to the Court, stating that Mr. Murtaugh had taken out multiple litigation loans and that the settlement had been reached on the Friday before trial.

187.    In fact, it was Defendant Goggin, not Mr. Murtaugh who took out multiple litigation funding agreements and the settlement was reached more than a week before trial was scheduled to start.

188.    Following the hearing, Mr. Murtaugh's new counsel finalized the settlement agreement with Amtrak's counsel, at Judge Cohen's direction.  Yet nothing in that agreement negates the fact that Defendant Goggin communicated Mr. Murtaugh's acceptance of the settlement without having obtained Mr. Murtaugh's informed consent to settle and after having fraudulently induced Mr. Murtaugh to settle.

**F.    Defendant Goggin and Jordan Litigation Funding worked together to enrich themselves at the expense of Mr. Murtaugh – and likely at the expense of other litigants**

189.    Defendants Goggin and Jordan Litigation Funding hatched a scheme to enrich themselves and to minimize their own risk at the expense of Mr. Murtaugh.

190.    Defendants Goggin and Jordan Litigation Funding entered secret agreements to charge interest payments against Mr. Murtaugh without Mr. Murtaugh's knowledge or consent.

191.    In so doing, Defendants Goggin and Jordan Litigation Funding placed their own interest in recouping Jordan Litigation Funding's investment and limiting Goggin's risk over honoring Mr. Murtaugh's interest in pursuing his case at trial.

192.    The scheme worked as follows:

    a.    Defendant Goggin convinced Mr. Murtaugh to not return to work so that Mr. Murtaugh would require litigation funding.

    b.    Defendant Goggin convinced Mr. Murtaugh to get litigation funding from Defendant Jordan Litigation Funding and Jordan Litigation Funding gave Mr. Murtaugh a "preferred rate" for working with Defendant Goggin.

    c.    Defendant Goggin then took additional funding from Defendant Jordan Litigation Funding that was secretly leveraged against Mr. Murtaugh's case.

    d.    Defendant Goggin and Jordan Litigation Funding agreed to make Mr. Murtaugh personally responsible for paying outrageous interest rates as high as 25% on the funding that Defendant Goggin secretly acquired.

    e.    Defendant Goggin, as Mr. Murtaugh's lawyer working on a contingent fee basis, was obligated to fund Mr. Murtaugh's case and bear the risk involved with brining the case to trial.

    f.    Seeking to avoid the risk of going to trial, to protect his attorney fee, and to protect Defendant Jordan Litigation Funding's interest in the case, Defendant Goggin unduly pressured and fraudulently induced Mr. Murtaugh to settle his case.

    g.    Mr. Murtaugh was left with a net payment from his settlement of $141,469.67, even though Defendant Goggin had promised a "life

changing" amount of money and had expert reports supporting
$2,921,193.40 in economic damages.

193.    This scheme has caused significant economic damages to Mr. Murtaugh

194.    Defendants carried out this scheme over the course of several years and through at
least six different funding agreements.

195.    Based on the language in the funding agreement, including language that
Defendant Jordan Litigation Funding was giving a preferred rate because Mr. Goggin was Mr.
Murtaugh's lawyer, it is believed that Defendants have conducted this scheme with other clients
of Defendant Goggin.

196.    Defendant Goggin is also well-familiar with litigation funding, having previously
been an owner in a similar company – a company called Main Steet Business Funding, LLC.

197.    Main Street Business Funding, LLC was a "factoring company," which would
provide advance cash to companies in exchange for the right to collect certain invoices for the
company and receive an additional fee for doing so – very similar in the way Defendant Jordan
Litigation Funding advances cash for lawsuit plaintiffs in exchange for a large fee.

198.    Defendant Goggin's funding business, Main Street Business Funding, LLC, has
since entered bankruptcy proceedings and is no longer operating.  Defendant Goggin has also
been in a dispute with one of his prior business investors from Main Street Business Funding,
LLC.

199.    In this dispute, Defendant Goggin's former business investor has alleged that
Defendant Goggin mishandled his client's money.  It has been alleged that Defendant Goggin
"stole the majority of an Eight plus Million Dollar CSX settlement from a quadriplegic client."
Defendant Goggin and his prior business partner are engaged in active litigation in the case

*Keller & Goggin PC v. Jack and Lori Lane*, No. CV-2021-009465 (Del. C.C.P.), among other dockets.

200.    Defendant Goggin was also a shareholder of the company called Vermillion, Inc. In this role, Defendant Goggin brought a derivative claim against Vermillion, which was quickly dismissed by the State of Delaware Court of Chancery.  The Delaware Court of Chancery found Defendant Goggin to have violated ethical rules and acted improperly before the Court, opining:

> Goggin, one of the Plaintiffs in this action and a practicing attorney in Philadelphia, claims that, although he had previously only seen notarizations performed when the signer was actually in the presence of the notary, he approached Bennett about notarizing Bessenyei's signature and relied on her determination that notarizing the document of someone outside her presence was permitted. **As a Pennsylvania attorney, Goggin ought to have known better.**
>
> **Goggin's conduct in this litigation would seem to violate each of these ethical rules. On three separate occasions, Goggin caused his legal assistant to notarize verifications improperly, in violation of Pennsylvania law and in violation of Goggin's own professional ethical responsibilities.** On each occasion after Bennett affixed her notary seal to the verifications, Goggin, with full knowledge that the jurat on the documents incorrectly stated that it had been "SWORN TO and subscribed before" the notary by Bessenyei, transmitted the documents to Delaware counsel to be used in this litigation.

*Bessenyei v. Vermillion, Inc.*, C.A. No. 7572-VCN (Del. Ch. Nov. 16, 2012) (emphasis added).

201.    Defendant Norris Jordan, the owner of Defendant Jordan Litigation Funding, also has a history of fraudulent conduct.  The Financial Industry Regulatory Authority (FINRA) is the largest independent regulator of all securities firms in the United States, aiming to ensure that the investment industry operates fairly and honestly.  In 2017, FINRA hearing officers found that Defendant Norris Jordan engaged in fraudulent conduct, including violations of the Securities

Exchange Act of 1934 Section 10(b), Securities and Exchange Commission (SEC) Rule 10b-5, and MSRB Rule G-17.

202.    The FINRA Office of Hearing Officers found that Defendant Norris Jordan:

> committed omissions of material fact when he failed to disclose the trades to the ultimate purchasers of the municipal bonds, in violation of the antifraud provisions of the federal securities laws; (2) Jordan engaged in deceptive, dishonest, and unfair practices in violation of MSRB Rules; (3) Jordan reported fictitious transactions in violation of MSRB Rules; and (4) Jordan provided false information to FINRA in violation of FINRA Rules. Market Regulation failed to meet its burden of proving that Jordan charged unfair and unreasonable prices in violation of MSRB Rules.[1]

203.    Defendant Norris Jordan was suspended for one year from having association with any company regulated by FINRA, was fined $7,000, and was ordered to pay disgorgement of $25,657.

204.    In sum, both principal actors behind the scheme to defraud Mr. Murtaugh – Defendants Goggin and Norris Jordan – have adjudicated histories of engaging in fraudulent conduct.

205.    Thus, it should be no surprise that Defendants came together to create this scheme to use Defendant Goggin's attorney services and Defendant Jordan Litigation Funding's services to prey on people like Mr. Murtaugh by using the largely unregulated litigation funding industry.

---

[1] The full opinion of the FINRA Hearing Officer is available on FINRA's webstie: https://www.finra.org/sites/default/files/OHO_Jordan_20120317482-03_092617_0_0.pdf

## V.      CLAIMS

### COUNT 1: CONDUCTING THE AFFAIRS OF A
### RACKETEERING ENTERPISE – RICO 18 U.S.C. § 1962(C)
### Plaintiff v. All Defendants

206.    The previous paragraphs are incorporated here as though set forth in their entirety.

207.    This count is asserted against all Defendants, and all Defendants are "persons" for purposes of 18 U.S.C. § 1962.

208.    The Defendants violated RICO and Plaintiff was injured as a result.

209.    Each Defendant is a "person" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

210.    Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the preceding paragraphs and as further described below.

211.    The RICO Enterprise consists of an association-in-fact, comprised of all Defendants.

212.    The Enterprise's purpose was to enrich themselves through taking out unauthorized litigation funding agreements from Mr. Murtaugh and passing the interest payment onto Mr. Murtaugh.

213.    The Enterprise engaged in, and affected, interstate commerce.

214.    Each of the unauthorized and fraudulent litigation funding agreements required material participation by all Defendants.

215.    Defendants jointly conduct, manage, and control the affairs of the Enterprise. The Enterprise could not function without Defendant Goggin and his firm providing the case that could be collateralized or without Defendants Jordan Litigation Funding and Norris Jordan to provide the funding.

216.    The Enterprise is a vehicle used by Defendants to carry out a pattern of racketeering activity.  All Defendants engaged in a pattern of racketeering activity by continuously, repeatedly, and over a protracted period; participating in a scheme and artifice to defraud in violation of 18 U.S.C. § 473 and § 1343.  The pattern is continuing because Defendants are still seeking to collect repayment by Mr. Murtaugh and are likely using their scheme against of clients of Defendant Goggin.

217.    Defendants violated the predicate act predicate act of dealing in counterfeit obligations or securities, 18 U.S.C. § 473, by creating a false obligation on Mr. Murtaugh through their secret litigation funding agreements and then attempting to collect the repayment and interest from such agreement against Mr. Murtaugh.

218.    Defendants violated the predicate act of wire fraud, 18 U.S.C. § 1343, by transmitting and causing others to transmit, by means of wire in interstate commerce, writings, signs, signals, pictures and sounds, all in furtherance of, and for the purposes of, executing a scheme or artifice to defraud.

219.    The predicate acts of dealing in counterfeit obligations and of wire fraud are related because they have the same or similar purpose, they target the same victims, and they have the same result: Defendants used Mr. Murtaugh's case as collateral in an attempt to collect exorbitant interest payments from the proceeds of his case.

220.    The conduct complained of herein has been repeated at least six times during a nearly 3-year period and is ongoing.

221.    As a direct and proximate result of the Defendants' pattern of racketeering activity, Mr. Murtaugh was injured in his business and property.  Plaintiff was directly caused to suffer:

(a)     A potential claim against him for the repayment of the litigation funding and any interest, totaling $135,492.81;

(b)     Loss wages due to Defendant Mr. Goggin advising him to refrain from working so that Defendant Goggin can continue on with his scheme, totaling an amount to be determined but estimated at more than $75,000 per year for three years;

(c)     Monetary harm from being required to take out his own litigation funding agreement with Jordan Litigation Funding for $33,060, plus interest for a total of over $59,450.44; and

(d)     Monetary harm from being prevented from his case proceeding to trial by Defendant Goggin and the Enterprise's scheme of needing to assure repayment, including the ability to present $2,570,408.40 in economic harm, as well as non—economic harm.

WHEREFORE, Plaintiff demands that judgment be entered against the Defendants, jointly and severally, in favor of Plaintiffs for recoverable damages in excess of $2 million, including an award of trebled damages as consistent with 18 U.S.C. § 1964(c), compensatory damages, and actual damages, as well as reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c), prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

### COUNT 2: CONSPIRACY TO CONDUCT THE AFFAIRS OF A RACKETEERING ENTERPRISE – 18 U.S.C. § 1962(D)
### Plaintiff v. All Defendants

222.    The previous paragraphs are incorporated here as though set forth in their entirety.

223.    This count is asserted against all Defendants.

224.    Defendants have agreed and conspired to violate 18 U.S.C. § 1962(c) as set forth above, in violation of 18 U.S.C. § 1962(d).  Defendants have intentionally conspired and agreed to directly, and indirectly, conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

225.    Defendants knew that their predicate acts of dealing in counterfeit obligations and wire fraud were part of a pattern of racketeering activity and agreed to the commission of those acts to further their scheme to defraud Plaintiff Mr. Murtaugh.

226.    As a direct and proximate result of Defendants' conspiracy, and the multiple overt acts taken by all Defendants in furtherance of that conspiracy, Mr. Murtaugh has been injured in his business and property, including the damages listed above.

WHEREFORE, Plaintiff demands that judgment be entered against the Defendants, jointly and severally, in favor of Plaintiffs for recoverable damages in excess of $2 million, including an award of trebled damages as consistent with 18 U.S.C. § 1964(c), compensatory damages, and actual damages, as well as reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c), prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

### COUNT 3: SECURITIES FRAUD
### Plaintiff v. All Defendants

227.    The previous paragraphs are incorporated here as though set forth in their entirety.

228.    This count is asserted against all Defendants and is based on violations of Section 10(b) o the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated by the SEC.

229.    It is a violation of the Exchange Act and the rules promulgated thereunder "[t]o make any untrue statement of a material fact or to omit to state a material fact ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5 ("Rule 10b-5").

230.    Defendants violated Rule 10b-5 by entering into secret litigation funding agreements, using Mr. Murtaugh's case as collateral, and seeking to recover the repayment and interest on these agreements directly from Mr. Murtaugh.

231.    At all times, Defendant Goggin owed fiduciary duties and a duty of care to Mr. Murtaugh and was required to disclose this information to Mr. Murtaugh.

232.    Defendant Jordan Litigation Funding also knew that it was withholding material information from Mr. Murtaugh by accepting the agreement with Defendant Goggin despite Mr. Murtaugh not agreeing to the litigation funding.

233.    At all times, Mr. Murtaugh reasonably relied on his attorney Defendant Goggin to act in good faith.

234.    As a direct and proximate result of the Defendants' pattern of racketeering activity, Mr. Murtaugh was injured in his business and property.  Plaintiff was directly caused to suffer:

    (a)    A potential claim against him for the repayment of the litigation funding and any interest, totaling $135,492.81;

    (b)    Loss wages due to Defendant Mr. Goggin advising him to refrain from working so that Defendant Goggin can continue on with his scheme, totaling an amount to be determined but estimated at more than $75,000 per year for three years;

    (c)    Monetary harm from being required to take out his own litigation funding agreement with Jordan Litigation Funding for $33,060, plus interest for a total of over $59,450.44; and

    (d)    Monetary harm from being prevented from his case proceeding to trial by Defendant Goggin and the Enterprise's scheme of needing to assure repayment, including the ability to present $2,570,408.40 in economic harm, as well as non—economic harm.

WHEREFORE, Plaintiff demands that judgment be entered against the Defendants, jointly and severally, in favor of Plaintiffs for recoverable damages in excess of $2 million, including an award of trebled damages, compensatory damages, and actual damages, as well as reasonable attorneys' fees and costs, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT 4: FRAUDULENT INDUCEMENT
### Plaintiff v. Defendants Goggin and Goggin Firm

235.    The previous paragraphs are incorporated here as though set forth in their entirety.

236.    Defendants Goggin Firm acted through the conduct of its agents, servants, employees, and ostensible agents, including Defendant Goggin.  Defendant Goggin Firm is liable for its own fraud and the fraud of its agents, servants, employees, and ostensible agents, including co-Defendants.

237.    Even though a settlement was ultimately reached in the underlying case against Amtrak and T-Mobile, Mr. Murtaugh may bring this action against Defendant Goggin and Goggin Firm because they fraudulently induced Mr. Murtaugh to settle his claim.

238.    Defendants made material misleading and knowingly false statements, including withholding information they had a duty to disclose, to Mr. Murtaugh.

239.    The fraudulent and outrageous conduct of Defendants Goggin and Goggin Firm includes:

    a.    Concealing from Mr. Murtaugh that their true reason for wanting to settle were based on the firm's and their own financial interests;

    b.    Concealing from Mr. Murtaugh that Defendant Jordan Litigation Funding's financial interests were influencing Defendant Goggin's decisions and advice;

    c.    Fraudulently claiming that Amtrak and T-Mobile would withdraw their settlement offer if Mr. Murtaugh did not agree to settle on Friday, February 24, 2023;

    d.    Falsely claiming that Defendant Goggin could not calculate the costs and fees on Mr. Murtaugh's case in sufficient time before ending to accept the settlement offer;

    e.    Falsely claiming that they were committed to taking the case to trial;

f.      Advising Amtrak's counsel that Mr. Murtaugh accepted the settlement offer on February 24, 2023 despite the fact that Mr. Murtaugh had not yet conveyed such acceptance;

g.      Concealing from Mr. Murtaugh that he had accepted the settlement with Amtrak on his behalf before receiving his consent to the settlement;

h.      Misrepresenting that the status of settlement negotiations and what could be accomplished in settlement negotiations;

i.      Concealing from Mr. Murtaugh that Defendant Goggin and Goggin Firm were unwilling to accept the risk of paying experts to go to trial;

j.      Intentionally withholding information that Defendants knew was material to Mr. Murtaugh, such as the relative merits of the case, the alternatives to settling, and the financial motivations of Defendants;

k.      Falsely claiming that it would benefit Mr. Murtaugh's case if he did not return to work;

l.      Intentionally advising and encouraging Mr. Murtaugh to wait until after his deposition to return to work, such that Mr. Murtaugh would have to deceive Amtrak and/or perjure himself at trial;

m.      Falsely advising Mr. Murtaugh that taking out a litigation funding agreement for living expenses was in Mr. Murtaugh's best interest; and

n.      Concealing form Mr. Murtaugh that Defendant Goggin was taking out additional litigation funding agreements against Mr. Murtaugh's case to pay for litigation expenses.

240.    Defendants intended that Mr. Murtaugh would rely on their fraudulent statements and intended that their conduct would induce him to accept a settlement with Amtrak and T-Mobile.

241.    Mr. Murtaugh justifiably relied on the fraudulent statements and conduct of Defendants.

242.    The fraudulent conduct of Defendants directly resulted in Plaintiffs accepting a settlement far below a reasonable amount, as well as other financial harm, such as several years of lost wages and unnecessary litigation funding bills.

WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages upon this Count of the Complaint against Defendants, individually, jointly and/or severally, together with costs of suit, interest, and attorney's fees.

## COUNT 5: NEGLIGENCE
### Plaintiff v. Defendants Goggin and Goggin Firm

243.    The previous paragraphs are incorporated here as though set forth in their entirety.

244.    Defendants Goggin Firm acted through the conduct of its agents, servants, employees, and ostensible agents, including Defendant Goggin.  Defendant Goggin Firm is liable for its own fraud and the fraud of its agents, servants, employees, and ostensible agents, including co-Defendants.

245.    Defendants Goggin and Goggin Firm owed Mr. Murtaugh a duty to refrain from negligent conduct by virtue of their attorney-client relationship.

246.    Plaintiffs may bring this claim against Defendants, even though a settlement ultimately was reached in the underlying case, because Defendants misstated the effect of the settlement agreement, including that Defendants took out secret litigation funding agreements.

247.    The negligence and outrageous conduct of Defendants Clark Hill, Rodney, and Roskovensky includes, but is not limited to, the following:

a.    Failing to abide by the Pennsylvania Rules of Professional Conduct, including Rules 1.2, 1.3, 1.4, 1.5, 1.7, 1.8, 1.16, 2.1, and 5.4.;

b.    Failing to obtain a reasonable settlement;

c.    Failing to obtain Mr. Murtaugh's informed consent before settling his case;

d.    Failing to provide Mr. Murtaugh with a timely accounting of his case;

e.    Failing to prepare for trial such that Mr. Murtaugh's case would be prejudiced at trial if he did not settle;

f.      Failing to advise Mr. Murtaugh to seek disability benefits;

g.      Failing to advise Mr. Murtaugh to seek work that accommodated his injuries;

h.      Advising Mr. Murtaugh to accept high interest litigation funding payments to support his living expenses;

i.      Failing to advise Mr. Murtaugh on the details, risks, and alternatives to litigation funding;

j.      Failing to inform Mr. Murtaugh that the Goggin Firm did not have the financial resources available to handle his case;

k.      Failing to inform Mr. Murtaugh that Defendants were taking out litigation funding agreements to cover case expense;

l.      Failing to inform Mr. Murtaugh that he would be liable for interest on the undisclosed funding agreements;

m.      Failing to inform Mr. Murtaugh on the full relationship between Defendants Goggin and Jordan Litigation Funding;

n.      Failing to advise Mr. Murtaugh that they were not committed to taking his case to trial if necessary;

o.      Concealing from Mr. Murtaugh that he had accepted the settlement with Amtrak on his behalf before receiving his consent to the settlement;

p.      Misrepresenting that the status of settlement negotiations and what could be accomplished in settlement negotiations;

q.      Failing to advise Mr. Murtaugh that he would still have the opportunity to settle his case if he did not accept the settlement on February 24, 2023;

r.      Failing to advise Mr. Murtaugh that they could have provided him with an accounting, or at least an estimated accounting, of his case costs and fees on February 24, 2023 before settling his case;

s.      Failing to provide Mr. Murtaugh with an accounting, or at least an estimated accounting, of his case costs and fees on February 24, 2023 before settling his case;

t.      Negligently recommending Mr. Murtaugh settle his case for a small fraction of what it was potentially worth at trial;

u.     Failing to provide appropriate advice about the prospects of the case if it did not settle;

v.     Negligently pressuring, intimidating, coercing, berating and cajoling Mr. O'Brien to settle;

w.     Failing to take steps to protect Mr. Murtaugh's interests over Defendants' financial interests;

x.     Failing to take steps to protect Mr. Murtaugh's interests over Defendant Jordan Litigation Funding's financial interests; and

y.     Failing to provide Mr. Murtaugh with all material information necessary to make informed decisions about settlement.

248.    Defendants' negligence directly resulted in Plaintiffs accepting a settlement far below the case's value, as well as other financial harm, such as several years of lost wages and unnecessary litigation funding bills.

249.    Defendants' conduct was not merely negligent, but was outrageous, reckless and in disregard of their client's best interests, justifying the imposition of punitive damages.

WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages upon this Count of the Complaint against Defendants, individually, jointly and/or severally, together with costs of suit, interest, and attorney's fees.

**COUNT 6: BREACH OF FIDUCIARY DUTY**
**Plaintiff vs. Defendants Goggin and Goggin Firm**

250.    The previous paragraphs are incorporated here as though set forth in their entirety.

251.    As Mr. Murtaugh's attorneys, Defendants Goggin and Goggin Firm owed Mr. Murtaugh common law fiduciary duties.

252.    These fiduciary duties included the requirement that Defendant Goggin and Goggin Firm act with the utmost good faith and solely for the benefit of the client in all matters for which they were employed.

253.    Defendants' breaches of fiduciary duties include the following:

a.      Failing to abide by the Pennsylvania Rules of Professional Conduct, including Rules 1.2, 1.3, 1.4, 1.5, 1.7, 1.8, 1.16, 2.1, and 5.4.;

b.      Failing to obtain a reasonable settlement;

c.      Failing to obtain Mr. Murtaugh's informed consent before settling his case;

d.      Failing to provide Mr. Murtaugh with a timely accounting of his case;

e.      Failing to prepare for trial such that Mr. Murtaugh's case would be prejudiced at trial if he did not settle;

f.      Failing to advise Mr. Murtaugh to seek disability benefits;

g.      Failing to advise Mr. Murtaugh to seek work that accommodated ihis injuries;

h.      Advising Mr. Murtaugh to accept high interest litigation funding payments to support his living expenses;

i.      Failing to advise Mr. Murtaugh on the details, risks, and alternatives to litigation funding;

j.      Failing to inform Mr. Murtaugh that the Goggin Firm did not have the financial resources available to handle his case;

k.      Failing to inform Mr. Murtaugh that Defendants were taking out litigation funding agreements to cover case expense;

l.      Failing to inform Mr. Murtaugh that he would be liable for interest on the undisclosed funding agreements;

m.      Failing to inform Mr. Murtaugh on the full relationship between Defendants Goggin and Jordan Litigation Funding;

n.      Failing to advise Mr. Murtaugh that they were not committed to taking his case to trial if necessary;

o.      Concealing from Mr. Murtaugh that he had accepted the settlement with Amtrak on his behalf before receiving his consent to the settlement;

p.      Misrepresenting that the status of settlement negotiations and what could be accomplished in settlement negotiations;

q.      Failing to advise Mr. Murtaugh that he would still have the opportunity to settle his case if he did not accept the settlement on February 24, 2023;

r.      Failing to advise Mr. Murtaugh that they could have provided him with an accounting, or at least an estimated accounting, of his case costs and fees on February 24, 2023 before settling his case;

s.      Failing to provide Mr. Murtaugh with an accounting, or at least an estimated accounting, of his case costs and fees on February 24, 2023 before settling his case;

t.      Negligently recommending Mr. Murtaugh settle his case for a small fraction of what it was potentially worth at trial;

u.      Failing to provide appropriate advice about the prospects of the case if it did not settle;

v.      Negligently pressuring, intimidating, coercing, berating and cajoling Mr. O'Brien to settle;

w.      Failing to take steps to protect Mr. Murtaugh's interests over Defendants' financial interests;

x.      Failing to take steps to protect Mr. Murtaugh's interests over Defendant Jordan Litigation Funding's financial interests;

y.      Failing to provide Mr. Murtaugh with all material information necessary to make informed decisions about settlement.

z.      Failing to act with good faith towards Mr. Murtaugh; and

aa.     Failing to act solely for Mr. Murtaugh's benefit.

254.    Defendants' breaches of fiduciary duties directly resulted in Mr. Murtaugh accepting a settlement far below a reasonable amount.

255.    Defendant Goggin Firm is liable for its own conduct and was as vicariously liable for Defendant Goggin's conduct.

WHEREFORE, Plaintiffs demand judgment for compensatory and punitive damages upon this Count of the Complaint against Defendants, individually, jointly and/or severally, together with costs of suit, interest, and attorney's fees.

**COUNT 7: VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION LAW 73 P.S. § 201-1
Plaintiff v. All Defendants**

256.     The previous paragraphs are incorporated here as though set forth in their entirety.

257.     All Defendants engaged in fraudulent or deceptive conduct that created a
likelihood of confusion or of misunderstanding about the litigation funding agreements.

258.     This includes Defendants entering secret litigation funding agreements and then
seeking to recover repayment and interest under those agreements against Plaintiff.

259.     Plaintiff has suffered injuries and damages as a direct and proximate result of this
conduct, as described above.

WHEREFORE, Plaintiffs demand judgment for compensatory and punitive damages
upon this Count of the Complaint against Defendants, individually, jointly and/or severally,
together with costs of suit, interest, attorney's fees, and all other damages available under the
UTPCPL.

**COUNT 8:  Civil Conspiracy
Plaintiff v. All Defendants**

260.     The previous paragraphs are incorporated here as though set forth in their entirety.

261.     All Defendants in the matter acted with a common purpose to do the unlawful and
outrageous act of entering predatory litigation funding agreements, including both the agreement
for to provide funding for Mr. Murtaugh's living expenses and the secret agreements between
Defendants alone, as described throughout this Complaint.

262.     Several overt acts were committed in pursuance of this common purpose,
including but not limited to entering the litigation funding agreements.

263.     Mr. Murtaugh has suffered actual legal damages as described throughout this
Complaint.

WHEREFORE, Plaintiff demands damages in excess of local arbitration limits be awarded in his favor and against all Defendants, jointly and severally, together with punitive damages, interest, costs, and whatever other relief is deemed just and appropriate under the circumstances.

**COUNT 9:  Declaratory Judgment**<br>**Plaintiff v. All Defendants**

264.    The previous paragraphs are incorporated here as though set forth in their entirety.

265.    Under the Declaratory Judgment Act (the "Act"), 42 Pa. C.S. § 7531-41, Pennsylvania courts "have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." According to the Act, "any person … whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."  The power of the courts to grant declaratory relief is to "be liberally construed and administered."

266.    There is an actual, substantial, justiciable, and immediate controversy about the validity of the litigation funding agreements.

267.    A declaratory judgment regarding Mr. Murtaugh's responsibility for repaying the litigation funding agreements will clarify conclusively the legal rights, status, relations, and obligations of the parties.

268.    Mr. Murtaugh is entitled to a judicial declaration that he is not responsible for the repayment of either the cash advance or the accumulated interest of the various litigation funding agreements.

269.     Rather, the agreements reached between Defendants Goggin and Jordan Litigation Firm are solely between those parties and Defendant Goggin is solely, or jointly with his firm, responsible for paying anything that may be due and owing to Jordan Litigation Funding.

270.     Further, because the litigation funding agreement taken by Mr. Murtaugh for his personal expenses was the result of Defendants' fraudulent, negligent, and unethical advice, Defendant Goggin should be responsible for repaying any amount, including both principal and interest, of this agreement.

271.     Finally, because the agreement between Mr. Murtaugh and Jordan Litigation Funding is the result of a fraudulent, predatory, vague, and unconscionable arrangement in favor of Jordan Litigation Funding, Mr. Murtaugh should not be responsible for repaying any amount, including both principal and interest, of this agreement.

WHEREFORE, Plaintiff seeks declaratory judgment that he is not responsible for repaying any cash advance or interest to Jordan Litigation Funding.

**FREIWALD LAW, P.C.**

By:     s/Aaron J. Freiwald
        AARON J. FREIWALD, ESQUIRE
        ZACHARY S. FEINBERG, ESQUIRE
        Counsel for Plaintiff

Date:   January 3, 2024